UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In Re: | ) | |
| CHERI NICOLE SCRUGGS | ) | Case No. 13-27310-L |
|     Debtor. | ) | Chapter 13 |
| | ) | |
| CHERI NICOLE SCRUGGS, | ) | |
|     Plaintiff, | ) | Adv. Proc. #: _____ |
| | ) | |
| v. | ) | |
| | ) | |
| ANNETTE AUSTIN ESTES, | ) | |
|     Defendant. | ) | |
| | ) | |

COMPLAINT FOR MONEY DAMAGES AND FOR INJUNCTION

Pursuant to § 362(a) of The Bankruptcy Code, and Federal Rules of Bankruptcy Procedure 7001 and 7003, respectively, comes now Plaintiff-Debtor, by and through counsel, seeking an order awarding her damages, whether actual, special, consequential, or punitive, as well as any fees or costs, to which this Court finds her entitled. In support of this Complaint, Plaintiff states as follows:

PARTIES, JURISDICTION, & VENUE

1. Plaintiff Cheri Scruggs is a resident of Shelby County, Tennessee.

2. Defendant ANNETTE Austin Estes ("Defendant Estes") is a resident of Shelby County, Tennessee. Her present street address is unknown, but she regularly receives first class mail at P.O. Box 982, Cordova, TN 38088.

3. This adversary proceeding relates to the Chapter 13 bankruptcy case captioned above, namely: In Re Scruggs, No. 13-27310.

4. As Plaintiff primarily alleges violations of the automatic stay against Defendant

Estes, 11 U.S.C. § 362(a), this matter is a core proceeding, and this Court therefore possesses subject matter jurisdiction to hear it pursuant to 28 U.S.C. § 157(b)(1).

5. All other claims against Defendant Estes—which arise from the same facts and circumstances as those triggering this complaint for contempt—are related, non-core matters over which this court may exercise jurisdiction. 28 U.S.C. § 157(c). Plaintiff-Debtor specifically consents to the jurisdiction of this Court over these matters.

## FACTUAL ALLEGATIONS

6. For some time prior to the filing of the bankruptcy petition referenced above, Plaintiff and Defendant were business partners and friends.

7. Over the preceding years Defendant Estes and her late spouse, Mr. Jimmie Austin, lived a few years at a time at a number of different addresses. In September of 2011 Defendant Estes and her spouse expressed an interest in moving to Florida, and inquired of Plaintiff if she would be interested in leasing-to-purchase their then-current residence at 5074 Coro Road, Memphis, Tennessee, 38109 (the "Coro Lake Property" or the "Property").

8. Plaintiff expressed an interest in purchasing the Coro Lake Property, and, in exchange for financing and the Property itself, agreed with Defendant's husband to pay $6,000 in "option money" and, thereafter, to pay monthly installments of $1,350 over 15 years. The arrangement was never reduced to writing; there was no written contract of sale, no written note, and no written mortgage agreement or contract for deed.

9. On September 1, 2011, Defendant's husband conveyed the premises to TCS Property Management, the name of Plaintiff's sole proprietorship, by a quitclaim deed which Plaintiff would subsequently record on October 18, 2011 under Shelby County Register of Deeds

Instrument # 11102729.

10.     Tragically, Defendant Estes was widowed ten days after the original conveyance when Mr. Austin and his step-son drowned in a boating accident near their home on Coro Lake.[1]

11.     Following the loss of her husband Defendant Estes expressed her continued desire to turn the premises over to Plaintiff, but sought to delay the time when Plaintiff would take possession until Defendant could complete arrangements to live elsewhere. Plaintiff agreed to wait to take possession of the home until Defendant Estes could find suitable living arrangements.

12.     Plaintiff accommodated Defendant's request for more time to make other living arrangements, and did not take possession of the Property until Defendant Estes vacated the premises in May of 2012. Upon taking possession Plaintiff tendered $3,000 to Defendant Estes. In each of the following two months she remitted an additional $1,500 to Defendant Estes above and beyond her monthly payment of $1,350, thus fulfilling her obligation to pay a cumulative sum of $6,000 as "option money."

13.     For unknown reasons the relationship between Plaintiff and Defendant Estes began to deteriorate in January of 2013. Defendant Estes began to agitate for Plaintiff to pay more money or to quit the premises. Specifically, Defendant demanded that Plaintiff pay an additional $10,000 of "option money" or release the property. When Plaintiff refused, citing the original agreement she had with Defendant's husband, Defendant Estes put a "for sale" sign in Plaintiff's yard. These minor disputes escalated radically with the events of

---

[1] At this point in time Defendant's last name was still Austin. Upon information and belief, she has since remarried and taken her new husband's last name, Estes.

July 2013, as described below.

14.     In February of 2013, Defendant Estes filed with the Shelby County Register of Deeds a second quitclaim deed (Instrument # 13014848), purporting to bear Plaintiff's signature, and purporting to reconvey the Coro Lake Property back from TCS Management to Defendant Estes. This quitclaim deed bears a number of suspicious irregularities. First, Plaintiff adamantly denies ever signing this instrument. Second, the notary listed on the instrument's "prepared by" line, Ms. Octavia Kibble, denies ever being presented with the document, let alone preparing it. Third, the notary seal that does appear on the instrument belongs to Notary Morrow, a co-worker and allegedly a close personal friend of Defendant Estes. Upon information and belief, Notary Morrow recently owed a significant amount of money to Defendant Estes. Fourth, the signature which purports to be that of Plaintiff Scruggs looks markedly dissimilar from the signature that appears on the prior quitclaim deed as referenced in Paragraph 9, above. Plaintiff was unaware of this February 2013 quitclaim deed until some time after the wrongful eviction, described herein below.

15.     For a variety of other considerations unrelated to her escalating dispute with Defendant, Plaintiff filed her petition for relief under Chapter 13 of the Bankruptcy Code on July 11, 2013.

16.     During the morning of July 12, 2013, Defendant filed a forcible entry and detainer action against the Plaintiff in the Shelby County Court of General Sessions under docket number 1633649. She also contacted Plaintiff's relatives that day, threatening that unless Plaintiff removed her belongings from the residence Defendant would do it for her.

17.     Eventually, Defendant located Plaintiff at her place of business and confronted her

personally—giving her the same ultimatum on the afternoon of July 12th. During that interchange, Plaintiff specifically informed Defendant that she had filed for bankruptcy protection. Defendant was palpably enraged at that discovery, but nevertheless left Plaintiff's business after their conversation.

18.    At approximately 11:00 in the evening on the very next day, July 13, 2013, Plaintiff returned home from a long shift to discover that her home had been burglarized and that several items of personal property were missing. Some of the missing items belonged to the Plaintiff and some were items that the Defendant had left in the house. An electric stove, a deep freezer, and a dining room table that had all belonged to Defendant were gone. On the other hand, Plaintiff's laptop, microwave oven, freezer, DVR cable box, camera, and big screen projector, as well as her son's Xbox (video gaming computer) were all missing. Plaintiff promptly informed the Memphis Police Department of the break-in, and also shared her suspicions that Defendant had removed the personalty from the residence with the police officer who responded to her call.

19.    An officer returned to the home the following morning when Plaintiff discovered where the burglar had forced entry into the home. He examined the scene and also lifted latent fingerprint impressions from the window through which the perimeter of the home was breached. (Though it will be mentioned later in the Complaint, it is worth noting that Plaintiff would later discover photos of the Coro Lake Property, taken while these articles were still present, on a Keller-Williams Realty website advertising that the Property for sale, with Defendant Estes as the listing agent.)

20.    On or about July 13 or 14, Plaintiff received notice of the forcible entry and detainer

action that Defendant had filed with the Shelby County Court of General Sessions on the 12th.

21. On July 15, 2013, Defendant Estes called the law office of Plaintiff's bankruptcy attorney, Mr. Brad George, and inquired when Plaintiff intended to vacate the premises. On July 25, Mr. George spoke to Defendant by telephone, advising her that Plaintiff was lawfully on the premises, that Defendant should retain the services of an attorney, and that Defendant could not proceed with the state court eviction action Plaintiff without permission from this Court. Mr. George subsequently e-mailed Defendant a letter confirming that discussion, and attached copies of the notices corroborating that Plaintiff had filed and commenced a case in bankruptcy court. The notice of filing specifically stated that any attempt to collect a debt could be penalized under the Bankruptcy Code.

22. Unable to persuade Respondent to dismiss the state court lawsuit, or otherwise relent in her collection efforts, Plaintiff's bankruptcy attorney helped her file a notice of the bankruptcy case with the Court of General Sessions on July 25, 2013. The first setting of the General Sessions matter was the following morning, July 26. Neither Plaintiff nor her bankruptcy attorney were able to attend, but apparently the state court judge took notice of the bankruptcy filing fact, because the matter was dropped from the calendar. Upon information and belief, Defendant Estes did attend that hearing, and based on extensive prior experience with similar matters it is highly likely that the state court judge explained the legal effect of the automatic stay at that time.

23. Three days later, at around 9:00 in the evening on July 28, 2013, Plaintiff returned home from another long stint at work to find that all of the remaining personal property that

had been left in her home after the first break-in had been either taken or put out on the curb, and that all of the locks to the house had been changed. Among other personal effects, a trailer containing her late father's lawn service equipment was gone, and so was her small dog.

24.    Plaintiff immediately called police, informing them that she had been wrongfully evicted. The officer who arrived on the scene conferred with her, and, at her suggestion, called Defendant to inquire if she had played a role in removing Plaintiff's property or changing the locks.

25.    Defendant acknowledged changing the locks, but maintained that all of Plaintiff's property had already been removed when she arrived there. Plaintiff asserts that Defendant Estes claimed that a neighbor had called her to report another suspected break-in at the house, and she had come out to investigate. Upon arriving, Defendant claimed that there was no sign of Plaintiff's property, and she took the opportunity to change the locks at that time. The neighbor nearest the premises, Mr. Clay Hardgrow, denies ever contacting Defendant Estes at any time prior to Plaintiff's eviction.

26.    When the officers questioned whether her eviction had been court-approved, Defendant responded that court approval was unnecessary because she appeared to own the Property.

27.    As noted in Paragraph 14, above, a deed purporting to reconvey the property from TCS Management to Annette Austin (Defendant Estes) appears in the records of the Shelby County Register of Deeds. It was recorded on February 1, 2013, the very same day it was supposedly executed. While the instrument lists Octavia Kibble as the preparer, her seal

does not appear anywhere on the document. Indeed, Ms. Kibble denies ever seeing, much less preparing, the document in question. Instead, the document bears the notary seal of one Notary Morrow, whom Plaintiff knows to be one of Defendant Estes' close personal friends and whom she alleges owes Defendant Estes a significant debt. Plaintiff insists that the signature appearing in that document and purporting to be hers is a forgery, that she never appeared before Notary Morrow, and that Notary Morrow is sufficiently familiar with Plaintiff's signature to distinguish it from the one on that document. A comparison of Plaintiff's signature on the original deed from Jimmie Austin to TCS Management with the signature on the deed from TCS Management to Defendant Estes strongly suggests that the latter deed is a forgery. As noted above, Plaintiff was unaware of the existence of the Feb. 1, 2013 Quit Claim Deed until after the aforementioned wrongful eviction.

28.     Unfortunately for Plaintiff, the police officer who responded to her call on the night of the 28th informed her that, in light of Defendant's apparent ownership of the Property he had no power to grant Plaintiff access to the home. Plaintiff and her family were forced to live in a hotel room for the next two weeks, and with relatives for another two after that, until they could get another parcel of property they owned into a livable condition.

29.     Sometime after being evicted from the Coro Lake Property, Plaintiff noticed that Defendant Estes—who is a realtor by profession—had listed the Property for sale, and on the Defendant's realty web site Plaintiff found photographs that Defendant had taken inside the home at a time when Plaintiff's personal property was still inside it. Plaintiff's car appears in the driveway in one photo; her video projector appears in another; and various other personal effects are visible in the assorted photos that accompany the internet listing

for the property.

30. Plaintiff's personal property which was removed from the house has a cumulative replacement value of not less than $20,000.00. To date, Plaintiff has been unable to recover any of it.

## COUNT 1
### VIOLATION(S) OF THE AUTOMATIC STAY

31. The allegations contained in paragraphs 6-30 above are incorporated by reference in this section as if fully set forth below.

32. Because the original conveyance as described in ¶¶ 6-9 was not enforceable under Tennessee's statute of frauds, Defendant's relationship to Plaintiff is most likely best characterized as that of landlord and tenant by operation of law. Consequently, Defendant Estes was Plaintiff's landlord-creditor.

33. Plaintiff alleges that Defendant Estes was the one who initially broke into Plaintiff's home on July 11, 2013, and that when Defendant Estes removed both her own property and Plaintiff's (the freezer, Xbox, projector, etc., mentioned in ¶ 18 above), she did so with full knowledge that the protections of the Bankruptcy Code had already attached (¶¶ 16-18). Defendant Estes not only "exercised control" over the estate's possessory interests in the premises when she entered it to obtain her own property, but also took action to "obtain possession of property of the estate" when she removed Plaintiff's personal property.

34. When Defendant entered Plaintiff's domicile a second time, removed the remainder of her personal property, and changed the locks (¶¶ 18-22), she repeated and escalated those violations. She did so after clear and repeated warnings that her actions could subject her to disciplinary action. Furthermore, if the allegations that she persuaded police officers not to

intervene in her efforts to re-take the premises by means of a forged quitclaim deed are indeed true, her actions were both intentional, fraudulent, and purposefully contrived to circumvent the restraints imposed on her activities by the bankruptcy laws.

35.    Whether taken together as a continuing course of conduct or as discrete transgressions of the automatic stay, these incidents constitute particularly egregious attempts to "obtain possession" or obtain "control over" property of the estate, as forbidden by § 362(a) of The Code.

## COUNT II
### TRESPASS

36.    The allegations contained in paragraphs 6-35 above are incorporated by reference in this section as if fully set forth below.

37.    On the various occasions that Defendant Estes entered Plaintiff's home, first to remove various articles of personal property along with her own, and then a second time to remove the rest of Plaintiff's belongings and to change the locks, she did so without Plaintiff's consent and in derogation of Plaintiff's exclusive rights to possession and entry of the Coro Lake Property. Therefore, Defendant Estes is liable to Plaintiff for two separate counts of trespass under the law of Tennessee.

38.    With respect to the first incident, Defendant Estes broke into Plaintiff's home and removed both her own and Plaintiff's property. To the extent that Defendant Estes took pictures of the home while fully furnished, she not only corroborates Plaintiff's allegation that she was the intruder, but that the break-in was a malicious gesture, purposefully calculated to maximize the pain Plaintiff felt at the loss of her property.

39.    As to the second incident, Defendant Estes flatly acknowledged that she was on the

premises—whether to investigate a break-in, as she claimed, or not—to which she enjoyed no express or implied prior invitation from Plaintiff. This intrusion was at a minimum wanton (because she ignored repeated warnings to refrain from direct action against the debtor during the bankruptcy process), and oppressive. If she assuaged Police Officers' concerns through the use of a forged quitclaim deed, as Plaintiff believes and alleges, her actions were nakedly fraudulent. In any event, the features of Defendant's actions described in ¶¶ 32 & 33 demonstrate that Plaintiff should recover punitive damages under the laws against Trespass in Tennessee.

## COUNT III
### CONVERSION

40.     The allegations contained in paragraphs 6-39 above are incorporated by reference in this section as if fully set forth below.

41.     On the various occasions that Defendant Estes entered Plaintiff's home, first to remove various articles of personal property along with her own, and then a second time to remove the rest of Plaintiff's belongings and to change the locks, she did so without Plaintiff's consent and in derogation of Plaintiff's exclusive rights to possession and control of that personal property. Tennessee law recognizes the tort of conversion against those who assert rights of ownership or control inconsistent with the true owner's.

42.     Therefore, Defendant Estes converted not only all of Plaintiff's personal property—either by taking it herself, or by disposing of it in an eviction action—but her rights to possession and quiet enjoyment of the Coro Road Property, as well.

43.     As with the trespasses and the violations of the automatic stay, Defendant Estes' acts of conversion were particularly egregious for their oppressiveness, recklessness,

maliciousness, and fraudulence. Therefore, not only should Defendant Estes be held liable for all of Plaintiff's compensatory damages for the loss of her personal property, but also should be held liable for consequential, special, and punitive damages: Plaintiff should receive consequential damages for the cost of obtaining temporary alternate lodging and for the cost of preparing a permanent alternate living site while deprived of possession of the Coro Lake Property; she should receive special compensatory damages for the emotional distress and mental anguish she sustained after Defendant Estes maliciously took her dog, and posted pictures of Plaintiff's former possessions on her realtor's advertisement for the Property; and Plaintiff should receive punitive damages for the egregious pattern of conduct already described.

## COUNT IV
### INTENTIONAL MISREPRESENTATION / PROMISSORY FRAUD

44.     The allegations contained in paragraphs 6-43 above are incorporated by reference in this section as if fully set forth below.

45.     Defendant Estes' efforts to record the fraudulent deed demonstrate not only that she did not intended to convey the Coro Road Property to Plaintiff, rendering any representation to the contrary about this very-material-fact false, but that she knew any representation to the contrary was false.

46.     Thus, when Defendant Estes indicated that she would move forward with her late husband's agreement to sell the home to Plaintiff, and made clear that she still intended to move out of the Coro Road Property, she made a representation of material fact without a present intent to perform a promise of future action.

47.     Defendant Estes implicitly reiterated that representation—and therefore made a

representation of present material fact—by requesting that Plaintiff delay taking possession until May, and then ceding possession to Plaintiff when she vacated it.

48. That Defendant Estes reaped at least $6,000.00 in "option money" demonstrates that she not only intended for Plaintiff to rely on her representations that she would move forward with the sale—to procure a pecuniary benefit—but that Plaintiff suffered at least this much damage because of her reliance. No option money would have been due had either party explicitly re-characterized the relationship as a lease instead of a sale.

49. Plaintiff neither had reason to know that Defendant Estes' representations were false, nor relied on those representations unreasonably given that: Plaintiff and Defendant Estes had been close friends; that Plaintiff already had a deed from Defendant's late husband; that Defendant reaffirmed her desire to turn the Coro Road Property over to her; that Defendant acted consistently with that declaration by actually giving possession of the Property to her when she vacated it; and that Defendant concealed the forged deed from Plaintiff.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1. Entry of a judgment in Plaintiff's favor against Defendant Estes for all actual, compensatory, consequential and special damages suffered by Plaintiff on the causes of action set forth above (in such amount as is permitted by law and shown by the proof at trial) but not less than $20,000.00;

2. Entry of a judgment in Plaintiff's favor against Defendant Estes for punitive damages (in such amount as is permitted by law and shown by the proof at trial) but not less than $100,000.00;

3.      Entry of a judgment in Plaintiff's favor against Defendant Estes for all other relief to which she may be entitled, including attorney's fees, expert fees, costs, expenses, pre-judgment interest at the maximum rate, and post-judgment interest at the maximum rate;

4.      Entry of an order granting Plaintiff leave to sue Notary Morrow both for her complicity in Defendant Estes' scheme to commit fraud and for any other cause of action applicable under the facts and law as may entitle Plaintiff to relief against her;

5.      Entry of an order granting Plaintiff leave to sue Liberty Mutual Group, Inc., the company issuing Notary Morrow's surety bond, for any other cause of action applicable under the facts and law as may entitle Plaintiff to relief against Notary Morrow or against it;

6.      In the event that this Court declines to exercise jurisdiction over the various non-core causes of action plead against Defendant Estes in this Complaint, entry of an order granting Plaintiff leave to bring suit against Defendant Estes on those theories in the relevant state court;

7.      Inasmuch as Defendant Estes has demonstrated a clear lack of respect for the law and for the property of others, Plaintiff hereby seeks an injunction preventing her from gifting, selling, assigning or otherwise transferring ownership of any valuable property without first seeking and securing approval from this Court; and

8.      Any further relief which may be just and appropriate.

Respectfully submitted,


 /s/ Bruce A. Ralston
Bruce A. Ralston
Attorney for Plaintiff Cheri N. Scruggs
2400 Poplar Ave. #200
Memphis, TN 38112
(901)543-5045
(901)432-5212 fax
Attorney@bkmemphis.com


 /s/  Austin C. Fleming
Austin C. Fleming
Attorney for Plaintiff Cheri N. Scruggs
10859 Monterey Woods Cove
Eads, TN 38028
(901) 619-5845 Tel
austin.charl.fleming@gmail.com